Case No. 16-1575, Mark Brown v. Jeffrey Case v. others, argued as not to exceed 1575, or the appellate. I would like to request three minutes for my rebuttal. Three minutes, that would be fine. Thank you. May it please the court, Brian Keck on behalf of the plaintiff's appellants, Mark and Cheryl Brown. And I'd like to thank your honors for hearing this case today. It's a case I feel very strongly about and I'm honored to be standing before you here today. In this matter, the trial court incorrectly granted qualified immunity to the defendant officers involved in this case. Given that, number one, under the totality of the circumstances, a reasonable jury could ultimately determine that the seven shots fired at these two pet dogs, Baby Girl and Isis, were ultimately resulting in their deaths. Let's talk about something before we get into that. I'm concerned about whether the officers' actions violated clearly established law. Can you tell me which Supreme Court case says, or Sixth Circuit case says, shooting two dogs is a violation of the Fourteenth Amendment? Well, you're correct that there is not a Supreme Court case, and there's no Sixth Circuit case either that says that shooting a dog is clearly established right. Well, I will cite to you the Supreme Court case of Wilson v. Lane, 526 U.S. 603, which is a 1999 case. In that decision, it looked at a clearly established standard and it stated that a right is clearly established when a plaintiff is able to cite controlling authority in his or her circuit or a consensus of persuasive authorities to that extent. And what we have in this case is that ultimately eight circuits in this country have examined this very issue and all have come to the determination that a dog is an effect or property that can be appropriately seized under the Fourth Amendment. So we think that we at the very least have a consensus of authorities on this issue. And in fact, this issue was addressed by, and I know this isn't a controlling authority, but this was addressed by the Eastern District of Michigan in a case named Bateman v. Driggett. And in that case, the court ultimately came to the same conclusion that despite the fact that the Sixth Circuit hasn't examined this issue directly, that this is a clearly established right that can be violated. Judge, just to follow up on Judge Hood's question, the cases that you referred to, were those cases just referring to dogs as property in another context or were any of these cases involving a police raid where the police, either rightly or wrongly, were professed to be in fear of attack from the animals? Were any of these police raids such as we have here, or were they factually different from this case? In fact, many of the cases were police raids in which a dog was shot, either in the execution of a raid or even in the case of the Altman v. City of High Point, which is a Fourth Circuit case where you had an animal control officer that shot dogs in the execution of his duties as an officer, an animal control officer. But I can cite for the court the Brown v. Muhlenberg decision, which is a decision of the Third Circuit from 2001. We have the Grant v. City of Houston case, which is a similar scenario, a search warrant execution, dog shot in the execution of that search warrant. That was a decision of the Fifth Circuit. We have the decision in San Jose Charter of Hell's Angels, which was a 2005 decision of the Ninth Circuit. And we also have the District of Columbia's decision in Robinson v. Pizzat, which was, again, another situation where we have a raid ongoing and a dog is shot in the execution of it. Did you come across any cases that went the other way? That went the other way of the dog? Saying that it was property that was protected under the Fourth Amendment. Okay, so I just want to be clear that, are you saying that, are there any cases that have said that it is not a clearly established right? Yeah. There isn't a single case that I have come across in a Circuit Court case that have said that this is not a clearly established right? I'm not sure what right we're talking about. It's one thing to say that it's clearly established that the dog is property, subject perhaps to the Fourth Amendment. There's another thing to say that it's clearly established that you can't shoot a dog in the course of a raid. Do we have, do any of those cases say that it's clearly established that you can't shoot a dog in the course of a raid? Which is different from simply saying that the dog is property. That it's clearly established that the dog is property. That's different from determining whether a dog can be shot in the course of a raid and what the clearly established law about that might be. And Judge Clay, to answer your question, the questions in those cases aren't, is it simply that it's clearly established that you cannot shoot a dog in the execution of a raid? The question in those cases is, in the execution of a raid, can it be that an officer can act unreasonably in shooting a dog in the execution of that raid? And the answer in those cases is where the officer is acting unreasonably, and a jury could so find, then it is in fact a clearly established, or that is clearly established Fourth Amendment right? Because these cases have, on the one hand, held a dog is an effect, it is property. And on the same hand, we have the Fourth Amendment right against unreasonable searches and seizures of effects. And so if a dog is considered an effect, if we can, if the plaintiff is able to establish or a reasonable jury can come to the conclusion that they were unreasonable in seizing that dog. And obviously seizure would include meaningful interference with the property rights of those dogs, which would of course include killing and destroying that dog. In fact, one of the cases that we have, the dog wasn't even killed, the dog was merely shot. And nevertheless, the court felt that that was sufficient to constitute meaningful interference with the possessory rights of the individual. But let's get to the heart of it then. In this case, the officers say they had to shoot the dogs because the dogs were acting aggressively in the sense of barking. And the one dog, baby girl, I guess it was, was right there and was barking. And perhaps, I believe, she was the one that, I guess, she lunged. So why do we not have to grant qualified or approve the grant of qualified immunity to the officers under these circumstances? Well, first off, starting with, and I also want to note that ultimately we do have seven shots here. So starting off with what you've stated is the first shot, so the initial shot that was fired by Defendant Klein. In the case, what we have is the testimony of Defendant Klein. And he stated in his testimony that he was the first man inside this home. Okay. What's the importance of seven shots? You've got two dogs, seven shots required to dispatch two dogs. That doesn't sound all that bad if the dogs had to be shot. I would say that the relevance of the seven shots is that each shot, each use of excessive force, is entitled to its own determination as to whether the use of excessive force is reasonable. Use of force, not excessive force. I mean, putting an excessive in there, which is a conclusion that you say each use of force might be excessive. Yeah, and it's plain contention here that the use of force was excessive here. But what I'm saying is that look. In all the circumstances, the officers enter quickly, a dope raid, at least that's what they think it is. You've got two big pit bulls in there running around. And I don't know if I was an officer, I'd want to wait until the pit bull lunged before taking action to, you know, ensure the safety of myself and the other officers. So looking at the totality of the circumstances here, what did the officers do that was wrong? The cases clearly that have been determined in these other circuits have looked at, was the officer an imminent threat of harm? Not whether the dogs are merely an impediment to the search that's going on here. Why would it be unreasonable to feel that they were an imminent threat? They're in a closed-in, not-that-large house with two pit bulls, and they're unacquainted with the animals, to put it mildly. It would seem that they'd want to do something to protect themselves. I don't know if shooting the dogs was the best thing, but seemingly they'd need to do something very quickly. Starting off, if I could, with the first shot at Baby Girl, because we believe that there are material fact questions as to that shot, as to the reasonableness of it. And what we have is the testimony of Klein, who stated that I shot the dog at the threshold of the door before I entered that residence, and I shot it when I believed that it was lunging at me. That's his testimony. The problem is that the plaintiff has proffered testimony to the trial court that, number one, the shot did not occur until minutes after the raid began. Number two, the testimony of a... The plaintiff had been apprehended, who was out in the yard with, or out in the street with the officers. He was standing in front of one of the police cars looking at the home with Officer Sutherland. And Officer Sutherland also provided testimony in this case that the shot did not occur until multiple officers had already entered the building. And number three, the physical evidence that was present at the scene showed no blood on the carpeting of that living room. And why that is significant is because the officers have testified they saw the dogs in the window. Now, the barking question here is a contested issue of fact. A plaintiff said that the dogs weren't barking. So you have to accept that as true. Now, what we have here is the dogs... If the testimony is true, that multiple people went in there before the shot was fired, that there was no blood on the carpet, and only blood found was in the kitchen, that means that Baby Girl had to have been moving away from the officers at the time that first shot was fired. Not towards the officers, and certainly not at the threshold, which is what Defendant Klein testified in his deposition, and is what the defendants rely on for the rationale in firing that first shot. But taking that aside, both of the dogs are entitled to determination as to whether or not it was reasonable to kill them. And I would submit there is no rationale submitted here to the shooting of the second dog, Isis, whose only thing that was alleged against her was that she was standing there, barking, not even facing at the officer, but merely facing sideways. And Isis was in the basement, right? That's correct. It's uncontested here that Isis fled from the officers from the moment that home was breached until her ultimate shooting in that basement. Do you agree that there's unrebutted testimony that Isis was barking? I would agree, but no case decided yet has said that simply a dog barking is sufficient here for a jury to come to the conclusion that a police officer is entitled to qualify. Was there testimony that Isis had its teeth showing in any arguably aggressive fashion, or was it just that Isis was barking? I'll cite the exact testimony of Sergeant Klein, because I asked him, what was the basis for you thinking that these dogs were acting aggressively? And as to Isis, he said, the second dog, even after that happened, talking about the ultimate killing of Baby Girl. After firing three rounds at the first dog, the second dog turning, pausing, as it was moving across the basement, it stopped and turned and was barking. Thank you. Did you have a question? No, I'm fine. Thank you, Your Honors. Thank you both. I mean, thank you and more from the other side. Thank you, Your Honors, and may it please the Court. Sara Sahu here on behalf of the City of Battle Creek, as well as Sergeants Klein, Sergeant Case, and Officer Young. The Court gets it exactly right in its questions. This is a protective sweep case. This is a case about whether or not officers who are executing a lawful warrant issued by a neutral magistrate for a search of a house where there is probable cause to believe that there is evidence of narcotics distribution, along with weapons that are gang related, and evidence that someone is living there who has just been released from prison and who has continuously used that address as his residence before going to prison, and then now, as it appeared, coming out of prison, whether those officers may conduct a protective sweep of that house during the course of which they eliminate whatever threats are in front of them in the reasonable manner that they see fit to do that. They have to protect their safety. But what they do is they shoot the dogs. That's correct. So if we start out saying, yes, of course the officers can do a protective sweep, so grant you that, and I don't know whether my colleagues would, but let's assume that we say that. Why can they shoot the dogs? Can they shoot any dog that is there? Because any dog can bite, even a little Yorkie can bite somebody. Or is more required to allow officers doing a proper protective sweep to shoot and kill animals? For the moment, we'll take as an assumption that dogs are effects under the Fourth Amendment. No court has said they're not, right? That's true. No court has said that they're not effects. Now, in the Altman Court's analysis, it provides an originalist with a basis to say that they're not effects, but that Altman Court engaged in the most mature analysis, I think, of the Fourth Amendment issue and ultimately concluded that they are effects under its more thorough analysis, and I wouldn't quibble with that. I would say that, per Judge Clay's question, there's not a single decision out there that I've seen that has applied the Fourth Amendment in the context of a protective sweep. And there are cases out there that say the right wasn't clearly established, including Altman itself. But then to Judge Moore, your point in particular in that context, the answer is this. It depends on whether or not that dog, under the reasonable set of circumstances, is impeding the protective sweep like any other property. Now, what's reasonable in terms of a living being is different from what's reasonable in terms of something that's inanimate. I'll grant that. But this is an item of personal property. It's not an excessive force case. It's not a case that involves searches after the fact like the unpublished Fifth Circuit opinion in Grant v. Houston. That's a search after the fact. And every other case the plaintiff has cited, every other case we've talked about that I know of, involves dogs in the open fields, not in the confined circumstances of a protective sweep. So if you have a Yorkie that's rabid or particularly nasty, it jumps on the officer and won't get off, and for some reason the officers around can't simply grab the dog and put it in the bathroom, well, in those circumstances, lethal force might be necessary. I can't see right now how that would be reasonable for a small dog because usually you can just— That's my Yorkie. Exactly. And we have dog lovers and we have dog owners, dog owners on the SWAT team. I can't foresee a circumstance in which we would put a Yorkie down, but a 100-pound pit bull lunging indisputably. The plaintiff conceded on the transcript to the trial court that there was no evidence to contradict Sergeant Klein's testimony that the 95, 97-pound pit bull at the front door lunged at him. No evidence to contradict that. Now in the reply brief there appears to be a retraction of that position. I find that troubling, but that's what the transcript says in the trial court. Well, what your opponent argued in front of us was that there was no blood on the carpet there and a variety of other things. So how do you address those points? How could the shot have occurred there if there's no blood on the carpet? First of all, well, two parts to that answer. Whatever happened with the dogs throughout the house, the testimony of the officers is from top to bottom. They cleaned the house so that when the mother came home she wouldn't see pools of blood laying everywhere. So there was cleaning of whatever had happened. Now in terms of shooting a 100-pound pit bull where there's no bullet recovered up in the living room either, the bullet apparently was lodged in the pit bull. And so the fact that when it runs in a very small living room over to the kitchen and then down the basement stairs that you don't have a blood trail isn't particularly surprising if that pit bull was hit from the top or the side and then the bullet stayed within the pit bull as opposed to having some big leaky exit wound or something, which the dog didn't apparently have. So the other thing that is sort of emphasized by your opponent is that there's a fact question because of the testimony of Mr. Brown in terms of the timing as to when the shooting occurred and where the dog was and so forth. And Mr. Brown is obviously outside whereas the officers are inside. So that might go to the weight of the testimony, but is there not a fact question? No, there's not a genuine fact question. I mean, we have speculative issues all over the place. But courts don't treat testimony by someone speculating outside who admittedly was wailing, was incredibly emotionally distraught, was crying about their kids, may not hear half the things that are going on, frankly is not paying attention to or focused on what's happening at the door, can't see through the seven to eight officers of the SWAT team who are entering that house. Whether or not he heard the initial shot, and frankly we don't have to credit his self-interested testimony. Well, everybody's testimony is self-interested, isn't it? Why are you picking on him as being self-interested? Aren't the officers self-interested here? Well, I'd say the answer is that the testimony is self-serving and that he's the only person who can possibly offer that testimony from the curb. But the short answer is that's... It's self-serving, too. I just don't understand how we can say that any one witness is self-serving when everybody who's testifying is involved in this. It's a fair question, Your Honor, and there's some degree to which any witness can be characterized as self-serving, sure, especially since the officers here face individual liability. That said, it's undisputed that there are seven to eight SWAT officers going through the front door. These officers are armed. They're in full gear. It's a small house, a small door. It's not even credible that Mark Brown could see the dogs or see through that door. And Mark Brown admittedly said he couldn't remember basically anything from that time or he had memory trouble during his deposition remembering back that far, whereas our officers don't have that issue. Could the officers hypothetically shoot any pit bull that they saw in the house because hypothetically it's common knowledge that pit bulls are a particularly dangerous and hyperactive breed? Well, different courts would reach different opinions on that, and frankly I think that's why you wear the rope. The answer could be yes. I would not argue that far. I would say that the line between protected animals and non-protected animals depends on how the court defines domestic, and then once someone is inside the house in the course of protective sweep, we should analyze that particular, if it's a domestic animal, that particular animal using the same kinds of tests that we would use for any protective sweep. So if the pit bull is presenting aggressively, if the pit bull is behaving unpredictably, I don't think it needs to be charging. I don't think it needs to be lunging. If it's behaving in a way that's creating a risk and a danger that can't be controlled, if it's mature, fully grown, these things matter. If it's a baby pit bull and can be put in a bathroom that's been pre-cleared, then that's not a problem and that shouldn't be. I could imagine big snakes, because there are people who keep snakes as pets. People have boa constrictors or other such things. Would the officers who don't know how to deal with boa constrictors be able to come in and shoot it? I think it's an excellent question and one that I actually hope this court addresses, because in a more thorough analysis than what even was presented to the Altman court, I think that is an open question for this court, and the question is, when do kinds of animals become domesticated and when are they still feral? Once upon a time in this country, dogs were largely feral, and they weren't protected by the Fourth Amendment. Now they're domestic animals, and they are in my view, although I leave that to the court and I probably shouldn't concede that. But I would say that's the line. And so for boa constrictors, I personally would still view them as more feral than domesticated. And if our officers don't know how to deal with them, and I mean I can't have officers who are going to get killed by gang members or get killed by the snake just because they're busy trying to clear a place and the boa constrictor's aquarium falls over. What about the fact that Mr. Brown, and correct me if I'm wrong, Mr. Brown said there was nobody in there and here's my key to let you in so that you don't have to bash down the door. Should they have taken him at his invitation and used the key? And if he said there was nobody there, and they knew that there were dogs there because they'd seen him go out for a walk and come back with a dog, at least one dog. They did not know that no one was there. There was simply no information on that. Except Mr. Brown saying there was no one there, right? Didn't he say that or not? So Mr. Brown is not a gang member, let me make that clear, but any gang member detained outside a gang drug house can say the same thing. Hey, there's nobody in there, don't worry about it. Here, I'll get you the key. Let me give you five wrong keys while I'm interrupting your entry or while I'm setting you up for something worse. So the answer is no, it is not reasonable when you already have circumstances justifying a SWAT entry in the nature of this kind of warrant under the totality of circumstances of the reasonableness test as applied here. No, it is not reasonable to put what we will assume to be an innocent civilian in between you and your guns and the warrant that you have to serve and whatever mystery might exist behind that door. Let's go on to another subject. Why should the city be held liable? It absolutely shouldn't be. According to Plaintiff's own expert, there isn't a single law enforcement agency in this country that has the policy that they fault us for not having. And to quote the transcript, at page ID 1231, Plaintiff had conceded, quote, I don't think there's anything in the law that's on point that says a city should have a policy dealing with dogs or animals in the execution of a search warrant. I don't understand why we're not still relying on that concession that Plaintiff made during the trial summary. Well, I saw something in the record that they do have policies, don't they, about unreasonable, what you do with an unruly dog or something like that. So, Your Honor, I think you may be referring to, in 2015, the International Association of Chiefs of Police came out with a potential and suggested model policy which comes into play two years after this incident in the first place, and that's a model policy that is being worked through by some chiefs of police or by an association of chiefs of police that expressly does not reflect the current state of the law and certainly didn't even exist at the time that our officers executed this raid. And I would note also that policy, in terms of dealing with dogs, will deal with dogs during the course of a wide variety of searches. It's not focused on protective sweeps. It's not focused on SWAT raids. So, to get back both to your question and Judge Moore's question a little bit earlier and touches on both, by the time we are executing, for example, a warrant that doesn't involve a SWAT team where we're trying to seize papers related to some white-collar crime or something along those lines, well, there may be situations in which we can take a key from somebody to enter a house without having to break down the door, perhaps. In other situations where we're further along in the search, where we've already swept the house and swept the area that we're about to search, well, it may be that there are any number of steps that we can take with the dog that doesn't require putting the dog down. For example, if the backyard is fenced in and we're not searching the backyard, put the dogs out back and let them be there and close the door. But that's not the situation we faced here. We had to clear the entire house, including the basement, which is where the owners lived and which is where the dogs naturally, as guard dogs, tried to protect. And we appreciate that they were doing their job as guard dogs. That's what they were there to do. Unfortunately, that put them between the officers and the proper service of the search warrant. Your Honor, we rely largely on our briefs. So in this time, I wanted basically to address a couple of things that have been brought up in the reply briefs. We've already addressed the transcript citation to 1231. I'd note that plaintiff's concession that the larger pit bull had lunged at Sergeant Kline or that there was no evidence to contradict that was at page ID 1221. And at page ID 1222, again, on the hearing transcript below, plaintiff had agreed with Chief Judge Yonker that nobody said anything, again, to contradict that the dog was lunging. So that's 1221 to 1222. There's also no dispute in this case that there was no one on plaintiff's behalf inside the house during the search of the basement. At the end of the day, all of the testimony here is consistent. We've had exhaustive discovery. And at this point, there is no genuine issue. Picking up on one point that the Court was discussing with plaintiffs, I'd just note this. We do have four defendants. Each is entitled to their own review. The Court conducted a review in the trial court that provided appropriate reasons why each had not only acted in a way that was neither incompetent nor knowingly violating the law, but also in a way which, he said, it seems reasonable. Now, I would note for this Court that not only is it not clearly established, not only do we have qualified immunity because there's no court in this country that has yet addressed, to my knowledge, the application of the reasonableness standard as applied to dogs in the course of a protective sweep. Not only is that issue not clearly established here for our officers, but I'd also note and ask the Court to, in its de novo review, find that on this lengthy and exhaustive body of evidence in the record, our officers acted reasonably. I'd ask you to reach that decision and reach that issue because officers out there need to know what they can rely on. If officers can't pay attention first to the potential gang members in the corner who are armed or the potential folks who are destroying evidence, then we're going to have real problems on these raids. Officers need to have some guidance on what's reasonable. I posit to this Court, in its de novo review, that our officers acted reasonably. Thank you. Thank you, Your Honors. Thank you. I'd like to address a few things that were stated by the defendant, my brother counsel here. The important thing to note here is that before this raid began, there was no way that these dogs were going to survive, and that's just not my characterization of how the raid was conducted. That is the characterization of the commanding officer at the scene, Sergeant Case, who stated that knowing what he knew before he went into that house, before that house was raided, those dogs were going to die. That is his testimony on this point. Well, if the dogs had run into the bathroom, or say they were crated dogs and they ran into their crate, then they wouldn't have died, right? Well, Sergeant Case didn't even provide that hypothesis. I asked him, give me a hypothetical situation where these dogs survive here. And he said that knowing what I knew before that raid began, there was no way that these dogs were going to come out of there alive. But to your point, both of these dogs ran into a basement. And we have testimony of another surgeon of the Battle Creek Police Department who was a member of the emergency response team, who stated that in his actual involvement with the ERT, there were situations where dogs would go into a room not cleared. They would simply shut the door, clear the remainder of the home, then bring in the owner and allow the owner to move that dog to an area that had already been cleared, and then go into the room, that area, and clear that area. That could have been done here. There were multiple alternatives that existed that did not include killing these dogs. And that is certainly a contested issue of fact. I thought there was evidence in the form of testimony by officers that the basement was just filled with stuff and that they needed to look around. And if you think about rooms that are filled with stuff, people could be hiding behind boxes, et cetera. Well, certainly they have alleged that we were concerned that there might be this person, there might be that person. But the question for this court is what evidence did they have at the time they made that decision to come to that conclusion? And I ask the officers this very question in their deposition, what evidence did you have before entering that home? Having the only dangerous subject that they were aware of in police custody before the raid began, what evidence did you have that that home was occupied? The answer was none. Before you went into the basement, what evidence did you have that the basement was occupied? None. I thought they said they didn't know whether or not there was someone else in the home. That was the testimony of Sergeant Case. The testimony of Sergeant Klein is none. Why do you discount that testimony? Well, the facts are entitled to be determined in the light most favorable to the plaintiff here, and that's what I'm making my argument based on. What is it that the officers could have done that would not have involved interrupting or stopping the raid if the goal had been to ensure the safety of the animals? Number one, have nonlethal means of dealing with dogs. The testimony in this case is that the officers encountered dogs in search warrant raids often. So they should bring darts that they can shoot, you know, anesthetic darts. There are multiple means that have been provided by our expert and even Battle Creek Police Department officers that they have said were effective in the field, even in the execution of emergency response team search warrant executions. Okay, but that's not legally required. Well, what could they have done that might be characterized as being legally required? Well, the legal requirement is reasonableness. If this is an occurrence that occurs often, then it is reasonable for them to prepare for that occurrence that often occurs. That is the plaintiff's argument here. But more importantly, what we have argued here is there is a number of different alternatives available to the officers. Now, that argument goes to the city's Monell issue, not having a policy that said a nonlethal way of dealing with dogs. That argument you just made pertains to the matter of whether the city should have had a policy. Is that right? It goes to both. And, actually, if we look at the San Jose Charter, how the angels... You say both. What's the other thing that it goes to? Well, it goes to the decision by the sergeant at the scene, Sergeant Case, who is a named defendant here, in deciding not to bring nonlethal means with him to this raid. And his reasoning for not... Did they know in advance of the raid that there would be dogs there that they should be prepared for? Well, they knew on the way to the home that there was dogs there. That's certainly true. But, more importantly, what my argument is that this occurred often. And if this occurred often, then they had a duty to prepare for that eventuality. And not only that, there's a Beware of Dogs sign on the front of the home. There was an investigation done the night before, and somehow they didn't simply look at the front of the home to see a Beware of Dogs sign on the front of the home. So, what case would you rely on to say that they have a duty to bring nonlethal means with them? Well, I would rely on the Hells Angels case for that assertion. Hells Angels. That's correct, Your Honor. And I know that my time is done. Thank you. If there are any other questions, I'd be happy to answer those. Thank you very much. Thank you, Your Honor. Thank you for your argument. The case will be submitted. Would the clerk call the next case?